Here to ye, here to ye, this Honorable Pellet Court for the 2nd Judicial District is now in session. The Honorable Robert B. McCann presides. Please be seated. Your Honor, the first case on the docket this morning is 2-22-0332, Norse Nationstar Mortgage, LLC, to investigate its champion mortgage company, plaintiff Abilene v. Gerald Nordgren, special representative at Al, the defendant's account. Arguing on behalf of the accountants, Mr. Adam Jorgensen. Arguing on behalf of the accountants, Mr. Lewis Blakeman, Jr. Thank you. Mr. Goodman, you may proceed. On January 31st of last year, about 18 months ago, plaintiff Nationstar sent the estate of Marion Hauschild a document. In retrospect, perhaps it should have been attached to one or both sides' briefs, but it's in the record, C-660. And it's captioned, Cancellation of Debt in Unusually Large Type. And in box 3, it says, Amount of Debt Discharged, $293,000 something. And it says the date of the discharge was December 14th of 2021. Now, what happened on December 14th of 2021? What happened on December 14th of 2021 was that there was a judicial sale of the single family house at dispute in this case. A judicial sale, though, is tentative. It's of little or no legal or financial significance until the court approves the judicial sale. At which point, there's a final judgment, and at which point the buyer of the property can evict the people in there, assuming there's anybody in there, take possession of the property. If the buyer of the property is a third party, at that point, and only at that point, will the sheriff or the private sales officer give Nationstar or any other foreclosing plaintiff the money. If it happened here, Nationstar was a successful buyer or a successful bidder at the foreclosure sale. All Nationstar received later in the spring or summer of 2022, when this judicial sale was approved, was title and possession to the property. Right. Nationstar did not pursue financial remedies, right? Correct? Against the estate? Right. Other than the foreclosure? No. No. And let me ask you this. Your first argument, according to satisfaction, why was that argument not forfeited? Because it was not presented to the trial court. Why should we even consider it? Well, these arguments are illustrative. They're not. Pardon me? They're illustrative. We didn't plead them as affirmative defenses in our answer because they arose at 1150 or 1155, long after the pleadings had closed. And so they were offered, albeit in more summary fashion, to the trial court. And they were offered to this court to show that had Nationstar done this in 2017 or 2018, these things could have been pled as affirmative defenses. They become defenses at the 11th hour, perhaps at 1150, when Nationstar tenders the cancellation of debt. We're familiar with the record. Yeah. In your brief, you didn't say that this is illustrative. You made the argument that we should consider it, right? I don't think that's exactly correct, Your Honor. If you look in the brief on page 3 in the text underneath the long quote from the Code of Civil Procedure that sets forth examples of approved affirmative defenses, it says, these affirmative defenses arose minutes to midnight after the judgment foreclosure. The only place for defendants to raise them at the trial level was in response to Champion's motion for an order approving sale, that they go to the heart of Champion's claims. Accordingly, this court should find that the trial court erred in approving the sale. So we, by illustrative, and perhaps I'm being imprecise or inelegant. Right. You're being imprecise because you made the argument that you acknowledge you could have made it in the trial court in response. Well, I believe we brought up. Let me ask you this. For an accordance satisfaction to occur, the debtor must first have intended some form of payment or consideration to a creditor, who then must accept the payment or consideration as fulfillment of the debt. Where in the record is there evidence that the heirs tendered any form of payment or other forms of consideration to NationStar? They didn't. Okay. The property. They did not. Correct. Okay. Counsel, wasn't the notification that you referenced a U.S. IRS tax form? A blank form, yes. They filled out a form and put information in it. I believe there are multiple providers of such forms, but the content is prescribed by federal law. It wasn't, as Justice Burkett inferred, it wasn't a document executed by the parties that set across the top of an accordance satisfaction. It's unilateral conduct on the part of the plaintiff at Pelee NationStar. NationStar got the stationery, filled out the stationery as it thought was appropriate, and sent the stationery to the heirs. The heirs received the form. The form indicated in another section that this is section at the bottom, center, that it was invoking subsection D of the IRS regulations. Subsection D of the IRS regulations is that there's been an election by the lender of a foreclosure remedy that extinguishes or bars further collection. That is simply not the case. Do you see how anomalous it is when you say what you just said when Justice Burkett pointed out that an accordance satisfaction is action taken by both parties instead of just one? Unilateral means one side, I believe, unless, of course, it's an unusual football play where there's more than one lateral. But the form that was given or sent is supposed to be an indication to the IRS that someone has received for purposes of taxation income by the discharge of a debt, which meant, according to the mathematics of the federal government, if you don't have to pay back something that you might owe, that means that it's income and therefore the government gets to tax your discharge, correct? That's one half of it. The second half of it. The first half of it is that NationStar itself is taking a tax write-off. So that's sort of like the yin and yang. The issuer of the cancellation of the indebtedness is asserting that as of December 31st, 2021, it was entitled to write off the tax, the loss. And conversely, that created a tax liability on the part of the estate to pay tax on the difference between the fair market value of the house and the amount written off. The 1099 asserted that the fair market value of the house was $225,000. It's not clear where that estimate came from, but if we assume for purposes of discussion it's correct, that would create $70,000, 70-something thousand dollars worth of imputed income. Is the timing of the delivery or publication of the notification significant? Oh, it's exceptionally significant. Because here, NationStar jumped the gun. They should have waited until they realized cash. Therefore, instead of estimating that the house was worth $225,000, so it would be an exact dollar amount of cash they would have obtained from a third party for the house. And then, having obtained that cash, $200,000, $250,000, $300,000, whatever it was, they could tell whether there was an ability on their part to write something off accurately. And they could tell whether to report that to the IRS. Well, they have to report it to the IRS. No, they do not. They only have to report it once they've realized income. Does the issuance of the 1099-C form, is that evidence of an intent to actually discharge a debt, or is it a means of satisfying a reporting obligation to the IRS? Or is it both? It's largely the first, but the crucial fact is that they didn't have a reporting obligation to the IRS unless they did a tax write-off. And they shouldn't have done a tax write-off because there was no significance to the December 14, 2021 judicial sale. The significance doesn't attach until, A, the judicial sale is approved by the trial court, by the circuit court, and, B, more importantly, until NationStar gets cash. They can get cash from the sheriff or a private sales officer, or they're the bidder, as happened here. They get cash. It could be months or even years later when the house is sold. When they get the cash, they should compare the cash to the debt. If the cash is less than the debt, then they can write off the difference, issue a 1099. Do you have any authority for your arguments that a 1099-C form constitutes a tender of payment for purposes of accord and satisfaction? Do you have any case law that supports that? I don't know that it invokes the accord and satisfaction, but there are other things. Let me ask you this. Isn't the majority view that a 1099 form evidences an intent to cancel a debt and not necessarily cancellation of a debt? Isn't that the majority view? The appellee's brief cites unpublished federal decisions. Here's a published one. This is a published one. FDIC v. Cash and 720, Fed 3rd 169. 1099 form is not evidence that the creditor had actually canceled the debt, but rather reflected at most the intention to cancel the debt in the future, summarizing the majority view. Are you familiar with that case? Yes, I believe it was cited in their brief. It is from 10 years ago, and it may well be correct. You can see that's the majority view. I don't know. Certainly the appellee's marshal, if you were just to count them, more authority than we marshal. Let me turn to another issue, release and discharge. What authority do you have for your argument that there's a release and discharge? Well, that would be the Connecticut appellate decision and the Kansas bankruptcy decision that we cite in our briefs, as well as just the language of the document. The language of the document says cancellation of debt. It says amount of debt discharged, and this is in the upper right-hand corner in the largest font on the document, cancellation of debt. And then in square two, it says amount of debt discharged. What are the requirements in Illinois for a release and discharge? Is it a set forth in the Mortgage Act? In the Mortgage Act, a release and discharge shall be filed with the recorder or registrar of titles, and once filed, the recorder shall record and register the release. Where in the record is there any evidence that the recorder registered the release? Well, I don't know whether Nation Star filed the judicial sales deed or not, or whether the Lake County Sheriff filed the judicial sales deed or not, but I think Your Honor is looking at it in an incorrect way. The question is not whether the mortgage or the note was released. The note would have merged into the judgment when the trial court entered the judgment previously. The question is whether the debt has been discharged, not any particular instrument or document. And that's particularly true here where the original borrower was dead, so the children and nieces or nephews of the original borrower wouldn't have any personal liability for deficiency. The State might have tax liability. Would you agree that a release, which constitutes the type of agreement between the parties, requires consideration? With this element, to be a release and discharge of sole, where is the evidence that the heirs or the estate provided any form of consideration as necessary for the debt to have been released or discharged, released and discharged? Well, there's all sorts of consideration. The Nation Star got a tax write-off, and the estate got tax liabilities. So those are balancing accounting entries which provide mutual consideration. Moreover, Nation Star is trying to have like double...  The estate doesn't inherit a debt as a result of the foreclosure proceedings and the release? Of course it does, Your Honor. They sent a cancellation of debt to the IRS asserting that the $293,000 in debt was canceled and $225,000 was the fair market value of the property. That created a $74,000 tax liability that the estate would have to pay ordinary income tax on. That's ample. You know, that's money that Nation Star basically took out of the estate's pocket. Nation Star accelerated its tax write-offs by filing and sending the estate this 1099C long before they should have. In doing so, they accelerated their own tax write-offs and created phantom income. You know, bad debt. When people say, you know, I'm with a law firm, when we write off receivables or whatever, when bad debt means debt that you don't think you're going to be able to collect. And if you use accrual accounting and you write, which a business of over $5 million, which the plaintiff would be, is required to do, and you write off balances uncollectible, you're supposed to stop collecting it. Here, they wrote this off as of December 14th, 2021, or December 31st, 2021. And then in the spring of 2022, they continued to collect it by asking Judge Waterstrass in Lake County to approve the sale. Sir, your time is up. Thank you. My colleagues don't have a question. I have a question. Certainly. I believe you said something to the effect that the 1099 is supposed to be issued when they receive or realize the cash. Am I correct in my recollection? Sure, yes. And this was a sheriff's sale? I believe so. And was the mortgagee the highest bidder on the property? I believe so. Was there a deficiency judgment at all? I don't remember, but that document would be in the record. Well, even if there were a deficiency judgment, when, based upon a bid by the highest bidder, who happens to be the mortgagee, when does the mortgagee actually realize the cash that you were making reference to? Because I believe what they are bidding is the amount of the outstanding debt on the mortgage, which means it's a washout, which means they don't get the money. Am I wrong or what? Yes, you're quite wrong. They get the cash when they hire a broker or they hire an auction company and they sell the house to a third party. Of course. And when did they sell the house? They haven't done it yet. So should they be prosecuted for filing a 1099 based upon an accrual basis versus the cash basis, which supposedly would then, through some interconnected legal and philosophical transaction, result in the forgiveness of the debt? So when I asked you originally about the significance, how is it significant if there hasn't been any cash realized yet? Well, the answer to your first question, should they be prosecuted, I don't think so. I think it's a mistake. I don't think there's likely mens rea. Although, we did call them on it and gave them the opportunity to retract or replace the 1099 and they didn't do so. With regard to the broader question, though, is when is a lender entitled to write off a bad debt and when does it create tax liabilities for the borrower? And I would respectfully suggest that the lender incurs a loss, or possibly no loss, possibly a gain, when the collateral is sold to third parties. And then if it's sold for less than the amount of indebtedness, that creates a tax loss, which can be deducted in that calendar year and reported to the counterparty January 31st of the following year. So until the property is sold, how would the trial court or anyone involved in the case know whether or not the approval of the sale was equitable or inequitable until the property is actually sold and cash is actually moved or transacted or transferred from one pocket to another? Well, there is a body of case law that's been developed. For example, there are cases saying that a fair bid should be at least 50% of the fair market value of the property. But this happens in the majority of foreclosure cases, Your Honor. In the majority of foreclosure cases, the foreclosing financial institution winds up with the real estate as a result of an approved sale. It is only in the minority of cases where there is a successful third party bidder. And the vast majority of financial institutions, at least in my experience, I don't know that my experience is fully representative, but I represent financial institutions. I represent borrowers. I've appeared before this court arguing on behalf of financial institutions. I've appeared before this court arguing on behalf of trustees. The vast majority of financial institutions do not treat a judicial sale as a reportable event. They treat realization as a reportable event. And, therefore, here I would respectfully suggest that they are stopped from having the sale confirmed because they wrote off the entire dollar amounted issue. Okay. Thank you. You'll be given an opportunity to make rebuttal. Mr. Minetti, you may proceed. Good morning, Your Honors. Good morning. May it please the Court, Counsel, my name is Lou Minetti. I represent the plaintiff at Believe Nation Star Mortgage LLC. Your Honors, Counsel's entire argument on appeal is that the 1099-C form by itself canceled the mortgage debt. But the position reached by the Illinois courts and the Seventh Circuit District Courts to consider the issue, the tax regulation itself, and the IRS's own statements about the tax law agree that a 1099-C does not determine if a debt has been canceled. As a result, the heirs have not met their burden to show that sale confirmation was improper. First off, Your Honors, the standard of review in this case is inbusive discretion. Section 1508 of the IMFL confers broad discretion on trial courts as to whether to confirm or disallow sales. And it's clear through case law that due to the circumstances of the case after sale, the equities of the parties have flipped, and it's the defendant's burden to show that one of the items in 1508B is present to attack the sale. In this case, the heirs ignore settled foreclosure law when they say that the review is de novo. That ignores the discretion of the trial court after a foreclosure sale, and that case law is clear that sale confirmation is reviewed for abuse of discretion. In fact, in their brief, they invoke Section 1508B to make their arguments. In your opinion, when should this 1099 been issued or sent out, if ever? The regulations, Your Honor, and the regulations state that the 1099 needs to be issued when the event occurs. I would note counsel spent a majority of the time of his oral argument talking about the minutiae of tax law and its effects, discussing accrual, whether cash is realized and at what point. Is there a write-off? He made some arguments about that. That was not presented in the trial court and is not in their briefs. They did not make tax arguments. They made a foreclosure argument that the issuance of the 1099C facially discharged the debt. It was evidence of it. The regulations are clear, Your Honor, that the form needs to be issued when the event, one of the eight specified events in the regulation occurs. Is this upon approval of the sale or is it based upon the transaction where the property is sold and consideration is given by a third party? The regulation, Your Honor, is clear that the discharge that they're talking about in the statute is not an actual discharge. So it's not tied to an event of actual discharge of a debt. In fact, the regulation states that solely for the purposes of the IRS's reporting requirements, a discharge of indebtedness is deemed to have occurred for the statute if there's been an identifiable event, and it states that reporting is required whether or not an actual discharge of the indebtedness has occurred on or before the date on which the identifiable event has occurred. So it's required even if the actual discharge hasn't occurred. And if there is a difference, meaning an amount and a difference which is supposed to be reported, how would that difference be noted or determined until the actual sale of the property to a third party took place? In other words, upon the approval of the sale by the court, there aren't sufficient evidentiary facts to indicate what that difference is or what the amount of write-off is. And you can disagree with me. I'm asking you a question in the form of a syllogism in an attempt to understand the logic behind this regulation. Yes, sir. Well, the regulation itself is quite clear that when they're talking about a discharge, it's not discussing an actual discharge. That's a distinct event that the reporting that's required is not talking about an actual discharge. It's talking about one of these eight statutorily defined events. And they make a sharp distinction between what you need to report statutorily, because it's statutorily defined a discharge, and an actual discharge. As the Northern District of Illinois stated in Luke, part of the confusion in the case is dealing with the 1099C issue. It stems from the use of the term discharge to mean something other than actual discharge. The identifiable events in the regulation are reporting requirements stated by the IRS, and the reporting is tied to the event, not the discharge. And, in fact, courts in Illinois and many district courts in the Seventh Circuit have held that a 1099C does not establish debt cancellation, which, again, is the heirs' argument on appeal, is that this notice document works some sort of discharge by itself, facially. This authority includes comments from the Third District of the Appellate Court, where in Reynolds v. State Bank v. White, they stated, the form itself is not a means of accomplishing an actual discharge of a debt. The plain language of the statute also notes that the occurrence of any of the aforementioned identifiable events is deemed to be a discharge that triggers mandatory reporting. And, in fact, the White case sets favorably to the IRS's own statement clarifying that Section 6050P and the regulations do not prohibit collection activity after a creditor reports by filing a 1099C. This is echoed by the Northern District of Illinois in the Luke case, where it says that many districts in the Seventh Circuit have held that issuing a Form 1099C alone is not prima facie evidence that the debt was discharged. Was there a deficiency judgment taken on the sale? There was, Your Honor. It was in run. It was what? It was in run. It was against the property. It was not a personal deficiency. Is there a reason, turning to another issue, is there a reason you did not cite Section 2 of the Mortgage Act in arguing against release and discharge? Simply because, Your Honor, the issue itself of whether or not this 1099C form works at discharge facially, I believe it was clear enough to not need to invoke Section 2 of the Mortgage Act, Your Honor. But you agree that for there to be a release and discharge, it has to be registered. I believe that's the language of the Mortgage Act, yes, Your Honor. Crucially, Your Honors, regarding again, counsel's argument on a P.O. didn't get into the minutiae of tax law. It stated that issuing the Form 1099C worked at discharge of the debt by itself. Crucially, the IRS released two information letters in October of 2005, which stressed, which responded to concerns by creditors about what this form means. In the first letter, the IRS responded to a creditor's concern that a 1099C would be construed, a written admission that it had discharged the debt. And it would make, as a result, after issuing it, it would make debtors unwilling to pay their obligations. In this letter in 2005, the IRS responded that it does not view a Form 1099C as an admission by the creditor that it has discharged the debt and can no longer pursue collection. In the second letter, the IRS stressed that filing a Form 1099C satisfies a statutory reporting requirement and does not prohibit collection activity after a creditor reports by filing a Form 1099C. The IRS itself, discussing its own law, is very clear about what a 1099C does and what it doesn't do. The heirs' argument on appeal here is that the 1099C purported to discharge the mortgage debt, that NationStar sent an IRS Form 1099C canceling the mortgage debt, and that a 1099C is a notice of debt cancellation and not a notice of judicial sale. And here at oral argument, they stress the title of the form. These arguments about the notice being the cancellation are meritless. It misreads the sharp distinction in the regulation between the events, which are deemed to be discharges, and an actual discharge of the indebtedness. Was the 1099C out based upon the judgment of foreclosure and the sale of the property, but prior to the approval of the sale? Correct, Your Honor. It happened after judgment, after sale, before confirmation. And the form itself, for counsel's arguments and statements about the language of the form, its title, how the boxes are described in the form, that's the IRS's form, Your Honors. In fact, if you look at the Form 1099C in the record, there's a link, an HTML link in the middle of the document to the form on the IRS's website. That's the IRS's form. It wasn't created by my client. They were statutorily required to issue it. The 1099C lists, as counsel can see or acknowledges, it's event D, which is the election of a foreclosure remedy, which, again, counsel stated at oral argument. That's what event D means. It was giving information about the judicial sale and reported it to the IRS as it was statutorily obligated to do. Regarding their specific legal theories on appeal, the accord and satisfaction argument has been forfeited. They did not raise it at the trial court. Additionally, the elements for accord and satisfaction are lacking. There was no bona fide tender. There was no bona fide dispute of the amount due or any tender of any sort of funds or an explanation why they think a 1099C is the same as tendering funds. So either way, either by forfeiture or just simply the fact that accord and satisfaction never happened here, it's not applicable.  There was no misrepresentation, which is a crucial element of any equitable estoppel argument. The 1099C accurately described the foreclosure sale. It was the date of sale. It was describing the event. And there was no reliance that they could possibly articulate. They said that they merely stated in their brief that they had no choice but to rely on the statements of the 1099C, but they don't even attempt to state what that reliance was. They're not the loan signatory here. Ms. Housechild has passed away. They are not on the loan. And they don't even attempt to state how this would impact their taxes in the form of reliance. And the text of the 1099C in this record states at the bottom, if you are a successor in interest on this property from a relative through death and you are not on the loan, this is for informational purposes only and is not an attempt to collect a debt from you personally. So even in the event of talking about Ms. Housechild, it was a reverse mortgage, so it was in the mortgage that no personal deficiency was available. So it is beyond reason that any sort of reliance happened here as far as someone's personal taxes. Additionally, Your Honors, even if the debt were discharged, even if Your Honors concluded that an issuance of the Form 1099C did something to the ability to collect the debt personally or to have it as a personal liability, again, aside from the fact that the IRS stated in their information letters that that is not the case, you can collect after issuing a 1099C form. But even aside from that, NationStar could still exercise its security interest in the property, which it did here. For example, this happens quite commonly in foreclosure courts in the instance of a bankruptcy. If a bankruptcy discharges personal liability of a note, it doesn't undermine the ability to foreclose. It just means that the lender cannot seek an in person deficiency. That didn't happen here. There was an in rem deficiency against the property. What is an in rem deficiency? Against the thing. I believe it's Latin for you, Your Honor. Against the property, not. So if the deficiency is taken against the property itself, so in the event that a borrower is able to pay back or exercise some sort of right to redeem, they would need to pay that amount as well. It is not something that can be converted into a personal judgment or a personal debt. So it's a lien against the property, and if the person wants to redeem the property, they can redeem it despite the fact that they have no personal liability. Correct. But they would need to account for that in rem deficiency to clear out, to clear that cloud on title, Your Honor. If an in rem deficiency is taken and the property is sold to a third party, that's it, nothing. It goes away. Do you know what a circumlocution is? Not off the top of my head, Your Honor. It's an argument that circuitous. I see, Your Honor. Pardon? I see. We arrive at the same point. You start at the beginning and you go to the end, which is the beginning, i.e., there's a foreclosure, there's a sale, a discharge of the debt legally at least to the extent that it is subject to final approval. You send out a notification, and based upon the notification that there's been a sale and there's been a transfer of title to the property, one then argues that the debt was canceled because title was passed and there was no further lien against the property for the amount of money he's doing owing. And so by using the notification of the existence of a discharge or a liquidation of the lien that was on the property, by transfer of the property to you or to your client via a sheriff's deed, one then argues that there is no judgment that should have been entered based upon the fact that there was a discharge. Do you see the argument or not? Your Honor, given the distinction between an actual discharge and what? The notification of the 1099 was given, made, published, mailed, whatever, on the basis that there was a foreclosure and a sale, which discharged any debt upon transfer of the title to the property. And based upon the discharge of the debt, based upon the legal proceedings, the syllogism then concludes that since there is no debt outstanding, there should never have been a foreclosure. I would say it's not. It's like you can't go back in time to your grandfather. I was going to say earlier, I believe that's a logical fallacy, but I couldn't tell you which one. It kind of calls a paradox. Yes, Your Honor. Okay. Any other questions? Your time is up. Thank you. Thank you, Your Honor. You may proceed. Thank you. Counsel began by suggesting that the standard review was abuse of discretion. That would be true if we were quibbling about whether the price realized was adequate or whether the sale was advertised in a newspaper that was intended to reach potential buyers and things like that. Those are discretionary acts. But if there's a legal error baked into the trial court's decision, then that legal question should be reviewed to note. What authority do you have for that proposition with respect to this particular issue? The Supreme Court has made an exception, correct? The authority that we're relying on is just the general authority that says that purely legal issues. Again, the Supreme Court has specifically said in this instance, the standard review is abuse of discretion. That language exists, but the context of that language is looking at the type of equitable decisions that judges make and chance here about whether something's fair, whether the sale price is fair or not. Do you agree we are bound by the decisions of the Illinois Supreme Court? Of course, Your Honor. But when there's a legal – it is well settled that when there's a legal – this Court has said many times, the Supreme Court has said many times, that when there is a legal issue that is intertwined with discretion – Questions of law are to note the review, okay? But the approval of a sale is a discretionary act. That's correct, but it's the only – Now, if you can establish that the question of law was improperly determined by the trial court, then you can argue that based upon that improper determination, no judge, no reasonable judge would have entered the judgment that that judge did insofar as an act of discretion. Precisely. Okay, so what is the legal error that supposedly taints this exercise of discretion? The legal error is disregarding the plain language of the cancellation notice. Your Honor suggested to Mr. Minetti at the tail end of his argument that this was a tautologous or circular, but it is not tautologous or circular for the following reason, and this is the legal error that the trial – I hear you say it. Right. Did you mean tautological? Circular, tautologous. I'm sorry, what word are you using? It sounds like you're saying tautologous. Tautologous, T-A-U-T-O-L-O-G-O. You're getting softer. Tautologous, I apologize if I'm mispronouncing it. Okay. The question – it begs the question, why is a judicial sale an identifiable event? And as I spent the bulk of my time before you earlier this morning trying to establish, there is no reason why the judicial sale is the identifiable event. Treating a judicial sale as the identifiable event results in premature acceleration of tax deductions to calendar year 2021 and results in premature assessment of tax liabilities to calendar year 2021, when in reality those tax deductions, if any, have yet to materialize, and that tax liability, if any, has yet to accrue. And, of course, creating tax liabilities for an estate reduces the potential distribution to the heirs and gives the heirs a financial stake. Now, counsel says, the IRS said in a letter it sent some creditor, some financial institution or creditor, in October of 2005 that it doesn't view the issuance of a 1099-C as definitively establishing cancellation. But why not? You know, if you look at the form, the form is captioned cancellation of debt. And it says on it date of cancellation. And it says – it has this sort of Miranda-type warnings that say that if you don't include it in your taxes, you're potentially in big trouble. And under those circumstances, they're double-dipping. They first wrote things off as of December 31, 2021. In other words, on the calendar year 2021 income tax return that they filed at some point in 2022, they took a deduction for this, and now they're simultaneously or in parallel or sequentially trying to collect sums that they already wrote off. That's not how bad debt works. You know, counsel says, I didn't make tax arguments in my brief and all this. That's simply not the case. The stopper arguments are based on the idea that they are improperly double-dipping. They wrote off these – they wrote off sums, and now they're trying to collect them through approval of the sale. Counsel, you may have questions. You may or may not. We'll find out shortly. Any other questions? I have one. You argue that it would be inequitable to allow the sale to be confirmed after plain efficient at 1099C. And that's the only – that's all you get is the form itself. There's no other evidence like in Hofer or other cases. There's no other evidence. And the overwhelming majority of courts have ruled that the issuance of the 1099C form is not prima facie evidence of discharge. So if we were to agree with you, wouldn't this mean that the defendant's heirs are entitled to indefinitely occupy the property? How is that equitable? It's – yes, I agree with you that that would be the consequence of reversing, and that would be perfectly appropriate because we – I'm not sure I agree with your characterization of overwhelming majority, but we talked about this in the main argument, that the majority of the authority seems to be able to well acknowledge that. But if – you agree that that would be the consequence. And how would that be equitable for the underlying mortgage that remains unpaid forever? Because they canceled it. They – on January – So you agree that the overwhelming authority is that the issuance of the form itself is not prima facie evidence of discharge. But the result here should be that we find that it is. Well, I don't know that I agree with the statement that this is – Well, what do you – what's the rationale? Overwhelming authority. We're relying upon the Kansas published bankruptcy decision, the Connecticut appellate court published decision. And the reason why it's equitable is as follows. We complained in Lake County to the trial court by opposing the sale and saying that they had done this prematurely and improperly. Instead of saying, oh, you're right. It hasn't been sold yet. We don't know how much we're going to get. We don't know if there's a profit or loss. We shouldn't have realized it in 2021. Here's a corrected – here's a corrected tax form to the IRS. Here's a corrected tax form to you. We're going to correct our income tax return and claw back this deduction, pay the extra tax. They doubled down. They said, no, no. We're allowing – Didn't the heirs double down as well in coming in late, asking for permission to file pleadings and then waiting, and then coming in late again and asking for a delay? Isn't that what happened? That's what – I didn't represent the heirs below. But you're representing them now. I understand. I understand. I'm saying that's what – that's what NationStar said in its appellee brief. That's what the records show. They said – okay. They said that – they said that there were delays in defending the case. I assume the delays had something to do with the coronavirus. If the delays had to do with people coming in late or file appearances after the normal time for them to file appearances, I didn't know whether those people were hand-served or whether they were served by publication or something like that, as unknown heirs and entities. But if the trial court allowed them to appear, and if the trial court allowed them to defend, despite the fact that the normal time to appear and defend had already lapsed, that was a discretionary decision on the trial court's part. And it's not tit-for-tat. The fact that at an earlier stage in the case that discretionary decision had been made in the heirs' favor, and perhaps in NationStar's judgment, does not shed any light on this cancellation of indebtedness tax issue that arose at 1150 or 1155 in the case. That's all I have. Thank you. We'll take the case under advisement. There will be a short recess. There's one more case on the call.